# IN THE COURT OF APPEALS OF IOWA

No. 21-1063
Filed August 31, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DAVID JOEL SEXTON HATFIELD,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Muscatine County, Thomas G.

Reidel, Judge.

        David Hatfield appeals his conviction for first-degree murder.  **AFFIRMED.**

        Theresa J. Seeberger, Iowa City, for appellant.

        Thomas J. Miller, Attorney General, Sharon K. Hall (until withdrawal) and

Darrell Mullins, Assistant Attorneys General, for appellee.

        Considered by Bower, C.J., Tabor, J., and Mullins, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**BOWER, Chief Judge.**

David Hatfield appeals his conviction for first-degree murder, in violation of Iowa Code section 707.2(1)(a) (2019). We affirm.

Hatfield was charged with first-degree murder after admitting to police officers he had shot his pregnant girlfriend Kaitlyn on October 16, 2019. He relied upon a defense that he did not intend to kill her and the shooting was an assisted suicide.

At trial, the decedent's mother, Jennifer, testified Hatfield and Kaitlyn had dated for a couple of months and then moved together to Hatfield's parents' home in August 2019. Jennifer learned Kaitlyn was pregnant shortly before the couple moved. Kaitlyn had been on prescribed medication for "some mental condition" but did not take the medication with her when she moved.[1]

Jennifer testified that in February 2019, Kaitlyn had made a superficial attempt at suicide. Jennifer opined Kaitlyn's action was more a plea for attention rather than a serious suicide attempt. The prosecutor asked, "What did she want from you or others?" Defense counsel objected, asserting "hearsay" or lack of personal knowledge. The prosecutor responded that Hatfield had opened the door with his assisted-suicide defense and "[w]e get to talk about her present mental state and desire to commit suicide." The court stated, "[T]he door is opened and . . . this question is all right on a limited basis, so the objection is overruled at this time." Without any further objections by defense, the prosecutor continued:

> Q. Did you talk about whether her attempts were genuine?
> A. Yes.

---

[1] Kaitlyn would not share with Jennifer what mental-health condition though Jennifer was aware that Kaitlyn did engage in self-cutting behavior.

> Q. And what did she say?  A. No, she scared herself and she would never attempt it again.
> Q. And what were the specific activities she tried to engage in in February of 2019?  A. She went into the river close to our home, and then I guess there was a cord involved.  She tried to hang herself, but it was superficial.  It was just a small line.

Kaitlyn entered a mental-health hospital for a week, was placed on medication, and began mental-health therapy sessions.  Jennifer testified the medications "seemed to help" and there was no further indication Kaitlyn wanted to self-harm or commit suicide.

After Kaitlyn moved away with Hatfield, Jennifer did not hear from her for about a month.  Kaitlyn had not taken her cellphone when she left and communicated with Jennifer via a social media messaging service under the name of Jonathan Tolamun.  Jennifer described Kaitlyn as "quirky."

Kaitlyn came back with Hatfield to visit Jennifer on October 13.  The three shopped, and Hatfield went to visit friends while Kaitlyn and Jennifer had a good visit.  Hatfield picked Kaitlyn up the following day, and Kaitlyn talked about coming again the next weekend to see her grandparents.  That was the last time Jennifer saw Kaitlyn.

On October 15 and 16, Jennifer received online messages from Kaitlyn's social media account.  According to phone records, Kaitlyn was using Hatfield's cellphone.  The tone of the messages received by Jennifer, her ex-husband, and her current partner on the 16th included messages from the Tolamun account about "crippling depression," "'bout to do a hurt," and something about firearms.  When Jennifer did not get a response to her messages to Kaitlyn, Jennifer

contacted Hatfield at 10:27 p.m. asking if he'd seen Kaitlyn.[2]  Hatfield replied at 10:39 p.m., "I haven't seen her, but I'm extremely worried about her."

At 10:51 p.m., Hatfield called 911 to report his girlfriend had "attempted suicide," she "shot herself in the side of the head," she was still breathing but "not lucid."  At 10:52 p.m., Jennifer messaged Hatfield, "Does she have access to firearms?" Emergency personnel arrived at the scene of the shooting at 11:02 p.m. Hatfield was about five feet away from Kaitlyn, who was laying on the ground on her back with a gun in her left hand.  She was bleeding from her left temple.  She was still breathing but her throat and mouth had filled with blood.  Kaitlyn was life-flighted to a hospital.  Hatfield responded to Jennifer at 11:11 p.m., "My stepdad has firearms, but I don't know where he keeps them."  Kaitlyn was pronounced dead at 3:26 p.m. on October 17.

In his statements to police in the early morning hours of October 17, Hatfield's story evolved.  In the beginning, Hatfield claimed that he and Kaitlyn went to the park to stargaze, she retrieved a handgun from the trunk of the vehicle, and shot herself while he attempted to dissuade her.  Next, Hatfield alleged that Kaitlyn tried to get him to fire the gun, he refused, she decided to shoot herself, and he tried to get the gun away from her but failed.  Later, Hatfield stated he got his stepfather's gun out of the trunk, fired a test shot to make sure the gun worked, and then shot her.  Hatfield insisted he did not want to shoot her but she begged him and said she was ready to go.  He admitted placing the firearm in Kaitlyn's hand after shooting her to stage the scene.

---

[2] Hatfield had just the prior day sent Jennifer a "friend" request on a social media platform, which she had accepted.

Autopsy evidence showed the gun was directly against Kaitlyn's left temple and in a position making it almost impossible to have been self-inflicted.

A jury found Hatfield guilty of first-degree murder, and he was sentenced to a mandatory term of life in prison. On appeal, Hatfield contends his trial counsel was ineffective in failing to object to the prosecutor's closing statements and the trial court erred in overruling his hearsay objection to Jennifer's testimony about her daughter's statement about never attempting suicide again.

*Authority to address claims.* We have no authority to address Hatfield's ineffective-assistance-of-counsel claim on direct appeal. *See* Iowa Code § 814.7 (stating an ineffective-assistance-of-counsel claim "shall not be decided on direct appeal from the criminal proceedings"). Hatfield urges us to address the issue via "plain error"; our supreme court has repeatedly declined to adopt that doctrine. *See State v. Treptow*, 960 N.W.2d 98, 109 (Iowa 2021). This court is not at liberty to set aside supreme court precedent. *See State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App.1990) ("We are not at liberty to overturn Iowa Supreme Court precedent.").

*Hearsay.* We turn to Hatfield's hearsay challenge. We generally review evidentiary rulings for an abuse of discretion, but hearsay issues are reviewed for correction of errors of law. *State v. Buelow*, 951 N.W.2d 879, 884 (Iowa 2020).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Iowa R. Evid. 5.801(c). Hearsay is not admissible unless it falls within a recognized exception. *See* Iowa Rs. Evid. 5.802, .803.

The defense objects to the mother's testimony that Kaitlyn said "she would never attempt [suicide] again." Hatfield asserts the hearsay exceptions for

statements of present sense impressions and then-existing mental, emotional, or physical condition are not applicable. He asserts the statement was made about a week after the February 2019 suicide attempt and thus was not "made while or immediately after the declarant perceived it." *See* Iowa R. Evid. 5.803(1) (allowing a statement "describing or explaining an event or condition, made while or immediately after the declarant perceived it"). And, focusing on the word "never," he argues the statement is about Kaitlyn's state of mind in the future and thus not "then-existing." *See* Iowa R. Evid. 5.803(3) (allowing "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)"). He contends allowing the statement was not harmless error because "it likely convinced the jury that [Kaitlyn] would never have attempt[ed] suicide again," which "would have made it almost a foregone conclusion that the defendant's actions easily satisfied all of the elements of murder in the first degree."

We conclude the defendant mischaracterizes Kaitlyn's statement that "she would never attempt [suicide] again" as necessarily one of future intent. Kaitlyn may well have intended *then* not to attempt to kill herself in the future. That statement does not in itself mean she would never have changed her mind. We find no error in the court allowing the statement as relevant to the assisted-suicide defense.

**AFFIRMED.**